1
2
3
4          UNITED STATES DISTRICT COURT
5            DISTRICT OF NEVADA
6                      * * *
7   LEROY EDWARD DOOLEY,                    Case No. 3:21-cv-00126-LRH-CSD
8                          Plaintiff,       ORDER
9        v.
10  NEVADA GOLD MINES, LLC, a limited
    liability company; DOES I-X; ROE
11  BUSINESS ENTITIES I-X,
12                         Defendants.
13

14          Before the Court is Defendant Nevada Gold Mines, LLC's ("NGM") motion for summary

15  judgment.[1] ECF No. 69. Plaintiff Leroy Edward Dooley ("Dooley") filed a response in opposition

16  to the motion (ECF No. 75) and NGM replied (ECF No. 79). For the reasons articulated herein,

17  the Court grants in part and denies in part the motion. The Court grants the motion as it pertains to

18  the failure to accommodate, and wrongful termination claims Dooley brings under the Americans

19  with Disabilities Act and Nevada Revised Statute § 613.330. The Court denies the motion as moot

20  as it pertains to Dooley's claims for economic damages.

21  **I.       BACKGROUND**

22          This matter arises out of alleged discriminatory actions taken by an employer against its

23  employee based on the employee's disability. The employment relationship between NGM, a

24  mining company, and Dooley, a former employee of the mining company, is quite lengthy.

25  _____

26          [1]  Dooley names Newmont USA Limited ("Newmont") as the employer-defendant in his Complaint.
    *See* ECF No. 1-1 at 4. In May of 2021, United States District Court Judge Gloria M. Navarro
    granted the parties' stipulation to substitute NGM for Newmont as the real party in interest. *See*
27  ECf No. 23. NGM is an entity that was formed in March of 2019 as part of a joint venture between
    Newmont and Barrick Gold North America. *Id*. As a result, NGM assumes from Newmont the
28  liabilities that potentially arise out of this litigation. *Id*. For clarity in this Order, the Court refers to
    NGM, not Newmont, when referencing Dooley's employer and the parties' relevant arguments.

                                              1

Relevant here, NGM hired Dooley as a Process Maintenance Mechanic at its Mill 6 site, amongst other sites, near Carlin, Nevada, on March 5, 2007. ECF No. 1-1 at 6. One year later, Dooley was promoted from Process Maintenance Mechanic II, Tech 5 to Process Maintenance Mechanic III, Tech 6 ("Tech 6"), for being a "very skilled mechanic" who was "qualified" for the upgrade. ECF No. 69-1 at 2–4. Dooley held the Tech 6 position at NGM until his termination on or about December 8, 2018. ECF No. 1-1 at 6.

Dooley suffered from numerous health issues and endured countless serious surgeries during his employment. *See* ECF No. 75-3 at 27, 28. In October of 2017 Dooley visited a physician who previously operated on him to address a moderate to severe pain he had developed that radiated from his back, down both legs, and into his knees. ECF No. 69-12 at 2. The physician believed Dooley's pain stemmed from adjacent segment degeneration in his lumbar spine at L3-4, recommended an epidural injection, and warned Dooley that if symptoms persisted a surgical procedure to fuse L3-4 may be required. *Id.* at 3. Dooley received an epidural injection. ECF No. 69-13 at 2, 3. However, Dooley's pain persisted, and he scheduled surgery for December 2017.

The physician performed Dooley's surgery on December 8, 2017, which included a bilateral posterolateral fusion at L3-4; a bilateral pedicle screw instrumentation at L3-4; wide decompression at L3-4 bilaterally; local bone graft harvesting at L3-4; and removal of hardware and exploration of a fusion at L4-5. *See* ECF No. 69-17. Dooley applied for and received approval for short-term disability payments through NGM because of the surgery. ECF No. 1-1 at 6. The short-term disability payment application process required Dooley and his treating physician to complete NGM's "Disability Claim Form" in which the physician indicated that Dooley could no longer perform the essential functions of his job as of December 8, 2017, but that he would be released back to work on April 9, 2018. ECF No. 69-16 at 2.

Dooley revisited his physician in early-March of 2018 and noted left sided back pain, left knee pain, and that he "felt something tear" after the surgery. ECF No. 69-19 at 2. Later that month, Dooley and his physician executed NGM's "Request For Update – Disability Benefits" form in which Dooley applied for an extension of his disability benefits and his physician indicated that Dooley would not be released to work until October 1, 2018. ECF No. 69-20 at 2. In late-

September of 2018, Dooley and his physician submitted an additional disability benefits extension form to NGM in which the physician indicated that Dooley would not be released to work until January 2, 2019. ECF No. 69-21 at 2.

NGM sent Dooley a letter dated November 1, 2018, warning him that his disability benefits and leave was set to exhaust on December 8, 2018. ECF No. 69-22 at 2. The letter instructed Dooley to immediately contact NGM if he believed that he could return to work and perform the essential functions of his position with or without reasonable accommodation. *Id*. Around November 27, 2018, a "Return to Work Form" was submitted to NGM in which Dooley's physician indicated that Dooley could return to work on January 2, 2019, Dooley's capabilities were "Permanent" and "Sedentary." ECF No. 69-23 at 2. In this form, the physician noted Dooley's lifting, carrying, sitting, standing, bending, reaching, squatting, twisting, and right and left hand and foot use abilities. *Id*. As to lifting, Dooley was released to lift: 10 pounds, up to 3 times per hour; and 5 pounds, up to 10 times per hour. *Id*. As to carrying, Dooley was released to carry: 15 pounds, up to 3 times per hour; 10 pounds, up to 10 times per hour; and 5 pounds, over 10 times per hour. *Id*. As to sitting, Dooley was released to sit 10 minutes continuously for up to 3 hours per day. *Id*. As to standing, Dooley was released to stand 20 minutes continuously for up to 5 hours per day. *Id*. The physician did not release Dooley to bend, squat, or twist. *Id*. Finally, the physician released Dooley to reach and use his right and left hand and foot up to 3 times per hour. *Id*.

After receiving Dooley's "Return to Work" form, NGM and Dooley held in-person meetings to discuss his return to work. ECF No. 69-10 at 5–8; *see also* ECF No. 75-3 at 59–70. While the specifics of these meetings are somewhat disputed, the end result is not: Dooley was terminated in December of 2018. ECF No. 1 at 6. Dooley alleges that NGM discriminated against him based on his disability because it never offered him reasonable accommodation, ignored his suggested accommodations, and refused to engage in good faith in an individualized interactive process to find a reasonable accommodation so that he could return to work. ECF No. 1-1 at 7. The Court notes that Dooley properly exhausted his administrative remedies via the Nevada Equal Rights Commission and the U.S. Equal Employment Opportunity Commission ("EEOC") and

received a "Notice of Suit Rights" for his claims from the EEOC before filing the Complaint. On November 30, 2020, Dooley filed the Complaint against NGM in district court for Clark County, Nevada. *See* ECF No. 1-1. NGM removed the matter pursuant to 28 U.S.C. §§ 1441, 1446, and 1331. ECF No. 1 at 1–3. In the Complaint, Dooley alleges violations of 42 U.S.C. § 12112, the Americans with Disabilities Act of 1991 ("ADA"), and Nevada Revised Statute § 613.330, *et seq*. ECF No. 1-1 at 8–10. Dooley also alleges that he is entitled to relief under Nev. Rev. Stat. § 613.432 and punitive damages under Nev. Rev. Stat. § 42.005. *Id*.

On March 21, 2023, NGM filed a motion for summary judgment on Dooley's ADA and Nev. Rev. Stat. § 613.330, *et seq*. claims for failure to accommodate and wrongful termination. ECF No. 69. NGM argues for summary judgment on each claim, but alternatively argues that should either claim survive, it is entitled to summary judgment on Dooley's request for economic damages. *Id*. Dooley opposes summary judgment on all counts. ECF No. 75. The motion is addressed below.

## II.     LEGAL STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining*

*Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)); *see also Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; "there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252.

**III.    DISCUSSION**

As a preliminary matter, Dooley brings his disability discrimination claims under the ADA and Nevada Revised Statute § 613.330, *et seq*. *See* ECF No. 1-1 at 8–10. Title I of the ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Put alternatively, the ADA prohibits employers from discriminating against qualified individuals with disabilities. *Bass v. Cnty. of Butte*, 458 F.3d 978, 980 (9th Cir. 2006). Nev. Rev. Stat. § 613.330 similarly proscribes an employer's discrimination against an employee based on the employee's disability. *See* Nev. Rev. Stat. § 613.330.

District courts in the Ninth Circuit, and Nevada courts, use the federal ADA standard to evaluate disability discrimination claims brought under Nev. Rev. Stat. § 613.330. *See Matthys v. Barrick Turquoise Ridge, Inc*., Case No. 3-20-CV-00034-LRH-CLB, 2023 WL 6379629, at *11 (D. Nev. Sept. 29, 2023) (evaluating plaintiff's Nevada law disability discrimination claims according to the ADA); *see also Ramirez v. Wynn Las Vegas*, *LLC*, Case No. 2-19-CV-01174-APG-BNW, 2022 WL 3715751, at *7 (D. Nev. Aug. 29, 2022) ("[a] claim for disability

1    discrimination under the Nevada statute is evaluated under the same standard as a federal ADA

2    claim"); *Shufelt v. Just Brakes Corp*., Case No. 2-16-CV-01028-GMN-CWH, 2017 WL 379429,

3    at *3 (D. Nev. Jan. 25, 2017) (applying "the same standard for [p]laintiff's combined ADA and

4    [Nev. Rev. Stat.] § 613.330 claim"); *Bullard v. Las Vegas Valley Water Dist*., Case No. 2-15-CV-

5    00948-JAD-VCF, 2018 WL 715358, at *4 (D. Nev. Feb. 5, 2018) ("[c]laims under this Nevada

6    statute are evaluated the same way as their federal analogs"); *Pope v. Motel 6*, 121 Nev. 307, 311

7    (Nev. 2005) (applying the federal ADA analysis to a discrimination claim brought under Nevada

8    law). The parties agree that Dooley's Nev. Rev. Stat. § 613.330 disability discrimination claims

9    are evaluated under the ADA discrimination claim analog. *See* ECF No. 69 at 26, n. 34; ECF No.

10    75 at 19 n.9. The Court proceeds by evaluating Dooley's ADA claims which simultaneously serves

11    as an evaluation of Dooley's state law claims.

12       Dooley's disability discrimination claims consist of a failure to accommodate claim and a

13    wrongful termination claim. *See* ECF No. 1-1 at 8–10. Failure to accommodate and disparate

14    treatment claims are recognized forms of disability discrimination in the Ninth Circuit. *Johnson v.*

15    *Board of Trustees of Boundary Cty. School*, 666 F. 3d 561, 567 (9th Cir. 2011) (citing *McGary v.*

16    *City of Portland*, 386 F.3d 1259, 1265–66 (9th Cir. 2004)). The Court begins its analysis with

17    Dooley's ADA failure to accommodate claim before addressing his wrongful termination claim.

18       **A.**     **<u>Failure to Accommodate Under the ADA</u>**

19       The ADA defines discrimination to include "an employer's not making reasonable

20    accommodations to the known physical or mental limitations of an otherwise qualified ...

21    employee[.]" *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010)

22    (cleaned up). Before the Court begins its analysis, another preliminary matter needs resolving. The

23    parties dispute what Dooley must establish as part of his prima facie failure to accommodate claim.

24    NGM claims that Dooley must show: (1) he is disabled under the ADA; (2) he is a qualified

25    individual; and (3) he suffered an adverse employment action because of his disability. ECF No.

26    69 at 7. Dooley claims that, after the Ninth Circuit's decision in *Snapp v. United Transp. Union*,

27    889 F.3d 1088 (9th Cir. 2018), he is no longer required to show that he suffered an adverse

28    employment action and, instead, is only required to show: (1) he is a qualified individual; (2) NGM

received adequate notice of his disability and desire for a reasonable accommodation; and (3) a reasonable accommodation was available that would have enabled him to perform the essential functions of the job. ECF No. 75 at 18, 19.

Even after *Snapp*, district courts in the Ninth Circuit commonly require a failure to accommodate plaintiff to show that he suffered an adverse employment action because of his disability as part of his prima facie case. *See Matthys*, 2023 WL 6379629, at *6 (requiring failure to accommodate plaintiff to provide sufficient evidence that "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual ... and (3) he suffered an adverse employment action because of his disability" (citing *Samper v. Providence St. Vincent Medical Center*, 675 F.3d 1233, 1237 (9th Cir. 2012)); *see also LeBarron v. Interstate Grp., LLC*, 529 F. Supp. 3d 1163, 1171–72 (D. Nev. Mar. 26, 2021) (requiring failure to accommodate plaintiff to make a prima facie showing that "(1) he is disabled within the meaning of the ADA, (2) he is a qualified individual that can perform the essential functions of the job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability." (citing *Samper*, 675 F.3d at 1237)); *Lezama v. Clark County*, Case No. 2-17-cv-00086-JAD-VCF, 2019 WL 10372775, at *3 (D. Nev. Feb. 12, 2019) (requiring failure to accommodate plaintiff to show that "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual …; and (3) he suffered an adverse employment action because of his disability") (citing *Samper*, 675 F.3d at 1237)).

Accordingly, the Court requires Dooley, for his failure to accommodate claim, make a prima facie showing that (1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *See Samper*, 675 F.3d at 1237. Failure to establish any of these three elements is fatal to Dooley's claim. *See, e.g., Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 272 (9th Cir. 1996) (affirming district court's grant of summary judgment where plaintiff failed to produce evidence showing she had a disability under the ADA).

Dooley and NGM do not dispute that he is disabled within the meaning of the ADA. The ADA defines "disability" to include "a physical or mental impairment that substantially limits one

or more major life activities" of an individual. 42 U.S.C. § 12102(1)(A); 29 C.F.R. § 1630.2(j). A person's ability to work is considered a major life activity. 42 U.S.C. § 12102(2) (defining "major life activity" to include "working"). It is obvious that Dooley's post lumbar surgery physical impairment substantially limited his ability to work. Accordingly, the Court finds that Dooley is disabled within the meaning of the ADA.

1. Dooley has failed to demonstrate that he is a "qualified individual" who could perform the essential functions of the Tech 6 position with or without accommodation.

NGM argues that Dooley's failure to accommodate claim must fail because he has failed to establish that he is a "qualified individual." ECF No. 69 at 2. A "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See* 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 989 (9th Cir. 2007) (en banc). In making this determination, courts in the Ninth Circuit perform a two-part test:

> We first determine whether the individual satisfies the prerequisites of the job; more specifically, whether 'the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires.' At step two, we determine whether, 'with or without reasonable accommodation,' the individual is able to 'perform the essential functions of such position.'

*Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1127–28 (9th Cir. 2020) (citing and quoting 29 C.F.R. § 1630.2(m)).

"The determination of whether an individual with a disability is qualified is to be made at the time of the employment decision" and "based on the capabilities of the individual with a disability at the time of the employment decision[.]" 29 C.F.R. pt. 1630, app. to § 1630.2(m). Therefore, Dooley's status as a "qualified individual" under the ADA is a by-product of his capabilities with his disability at the time of his termination. *See Anthony*, 955 F.3d at 1129 ("an employee must show she was qualified at the time of the adverse employment action, rather than at some earlier or later time"); *see also Dark v. Curry Cnty.*, 451 F.3d 1078, 1087 (9th Cir. 2006) (making determinations as to the plaintiff's abilities at the time of his termination); *Weyer v.*

8

*Twentieth Century Fox Film Corp*., 198 F.3d 1104, 1112 (9th Cir.2000) (stating that "one must be able to perform the essential functions of employment at the time that one is discriminated against in order to bring suit" under the ADA). Therefore, the Court must determine whether Dooley was a "qualified individual" at the time he was terminated.

As to the first inquiry, it is undisputed by the record that Dooley satisfies the requisite skill, experience, and education of the Tech 6 position. For example, when NGM promoted Dooley to Tech 6, it described him as a "very skilled mechanic" who was "qualified" for the position (ECF No. 69-1 at 4). Additionally, Dooley held the Tech 6 position for ten years and during that time, NGM praised and recognized him with countless employee awards. S*ee* ECF No. 69-11.

As to the second inquiry, however, NGM claims that Dooley has failed to show that he could perform the essential functions of the Tech 6 position with or without reasonable accommodation. ECF No. 69 at 2. Dooley argues he could perform the job with some form of reasonable accommodation. ECF No. 75 at 5. At the crux of Dooley's argument is his belief that there is genuine issue as to the essential job functions of the Tech 6 position. ECF No. 75 at 20. As sources of that genuine issue, Dooley relies on his declaration and attached job description that he wrote and provided with his opposition response to NGM's motion. *See* ECF No. 75-1. Dooley argues that his personal knowledge and extensive experience more accurately reflect the reality of the workplace and, therefore, more accurately reflect the essential functions of his Tech 6 position. ECF No. 75 at 20. Most simply, Dooley argues that the essential function of his Tech 6 position included the "PM Route" and that "[a]nything other than that were marginal functions[.]" *Id*.

Generally, "the essential function and reasonable accommodation analyses are separate: first, a court inquires as to the job's essential functions, after which the plaintiff must establish that she can perform those functions with or without reasonable accommodations." *Samper*, 675 F.3d at 1240 (*citing* Bates, 511 F.3d at 994 (en banc)). Although Dooley must establish that he is a "qualified individual" as part of his prima facie case, NGM has the burden of production in establishing what job functions are essential to the Tech 6 position. *See Samper*, 675 F.3d at 1237 (citing *Bates*, 511 F.3d at 991 ("much of the information which determines [a job's] essential functions lies uniquely with the employer") (en banc)). To meet its burden, NGM must provide

admissible evidence that would support a favorable finding by the fact finder. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citation omitted).

> i.     *Dooley has failed to produce evidence that raises genuine issue as to the essential functions of the Tech 6 position.*

Determining the essential functions of a position is a highly fact-specific inquiry. *Wright v. United Parcel Serv., Inc.*, 609 F. App'x 918, 919 (9th Cir. 2015) (quotation and citation omitted). "Essential functions" of a position are "fundamental job duties" and do not include "the marginal functions of the position." *Bates*, 511 F.3d at 989 (en banc). A function's essentiality is derived from many things, including whether the job exists to do the function, the "limited number of employees available" who can do the function, and if the function is "highly specialized." 29 C.F.R. § 1630.2(n)(2). Consideration is given to the employer's judgment as to what functions of a particular position are essential. *See* 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(3). Moreover, "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). However, an employer's job description is not conclusive evidence of that position's essential functions. *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001) ("an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description").

Here, NGM has provided admissible evidence in the form of a detailed job description for the Tech 6 position which establishes the essential functions of the position. NGM's job description contains an "Essential Job Duties" section in which it requires a Tech 6 to perform "all the Technician 5 level duties proficiently" in addition to an extensive list of other maintenance functions including advanced pump rebuilds, advanced pipe fabrication and blueprint reading, alignments, mobile hydraulic crane operator, advanced mill and crusher overhaul, conveyors and feeders, compressors, hydraulics, advanced structure and steel layout fabrication, welding, to computer skills, and autoclaves. ECF No. 69-25 at 54–57.

Notably included in the job description is a "Job Capability Study" which depicts the physical requirements of a Tech 6. *Id.* at 58–68. Specifically, the study includes a "Body

Mechanics" section that provides the minimum physical capabilities of a Tech 6. *Id.* at 61–64. That section states the following: sitting, lifting 60 pounds, pulling 50 pounds, carrying 60 pounds, pushing 50 pounds, climbing ladders, and reaching below the knees are movements required 1-5% of the workday; climbing scaffold/manlift, stooping, kneeling, crouching, crawling, reaching waist to knees, reaching chest to shoulders, and reaching above shoulders are movements required 6- 33% of the workday; and standing, walking, gripping, climbing stairs, twisting, and reaching waist to chest are movements required 34-66% of the workday. *Id*. The study also states that Tech 6 employees "may have to walk extensively, in addition to climbing stairs [and] ladders" and that their work "may include rough, uneven ground, slippery conditions, [and] slopes[.]" *Id*. at 67.

The Court finds that the job description provided by NGM clearly establishes the essential functions of a Tech 6 to include the skills required of a Technician Level 5 ("Tech 5"), the listed maintenance functions, and the physical requirements as outlined in the "Body Mechanics" section of the "Job Capability Study" (the "physical essential functions"). Not only is the job description clear and unambiguous on these essential functions, but all have been corroborated by various deponents and their testimony, including Dooley. For example, Dooley confirmed that a Tech 6 is required to be able to perform the requirements of, not only a Tech 5, but all requirements of the lower technician levels as well. *See* ECF No. 69-4 at 16. As to the maintenance duties listed, Dooley refers to several of them as functions he completed as part of his position throughout his deposition. *See generally* ECF Nos. 69-4, 75-3. And as to the physical essential functions, Dooley confirmed that he understood the "Body Mechanics" section of the "Job Capability Study" was part of the Tech 6 position and that the physical demands for a Tech 6 were very heavy. ECF No. 69-4 at 4, 7.

Dooley's argument that the essential functions of the Tech 6 position are "in serious dispute" is meritless and he has produced no admissible evidence to support it. More specifically, Dooley's argument that the essential functions of his Tech 6 position only included the PM Route and that anything else was a marginal function, fails for various reasons. First, there are admissibility issues with Dooley's declaration and attached job description, the two pieces of evidence he primarily relies on in support of his argument. Dooley's self-serving declaration is

unsigned, undated, and unexecuted. *See* ECF No. 75-1 at 12. Because Dooley's declaration is unsigned, undated, and unexecuted, the Court will not admit or rely on it or any attachment thereto in order to determine whether genuine issue exists as to the Tech 6 position's essential functions. *See* 28 U.S.C. § 1746 (requiring that a declaration be signed and dated); *see also Tobin v. City & Cnty. of San Francisco*, 747 F. App'x 584, 585 (9th Cir. 2019) (affirming district court's exclusion of plaintiff's unsigned declaration, in part, because it was unsigned).

Second, were the Court to admit and rely on the declaration and attachment, further problems persist. To begin, an uncorroborated and self-serving declaration alone does not create genuine issues of material fact. *See Dubois v. Ass'n of Apt. Owners*, 453 F.3d 1175, 1180 (9th Cir. 2006). Next, a plaintiff's allegations and speculations about the essential job functions of a position do not create genuine issues of material fact for trial. *Lezama v. Clark Cnty.*, 817 F. App'x 341, 345 (9th Cir. 2020) (affirming the district court's finding that a plaintiff's unsupported allegation and speculation that being able to lift fifty pounds was not an essential function of his position did not create issues of material fact as to the position's actual essential functions). Thus, genuine issue as to the essential functions of the Tech 6 position are not created merely because Dooley alleges the only essential function of his position was the PM Route and speculates that NGM's job description does not accurately reflect the position's essential functions.

Third, and perhaps most obvious, is that Dooley's argument, declaration, and attached job description contradict his prior deposition testimony and "a party cannot create an issue of fact" by "contradicting his prior deposition testimony." *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) (internal quotation marks and citation omitted). For example, Dooley claims that he held the position of "Preventive Maintenance Route ("'PM') mechanic" in his declaration, but states he was a "Mechanic Tech 6 at Mill 6" in his deposition. *Compare* ECF No. 75-1 at 3 *with* ECF No. 75-3 at 69. Dooley's declaration that he was a PM Route Mechanic also conflicts with his deposition testimony that he understood the PM Route was a task, not a position. ECF No. 75-3 at 71. In his declaration, Dooley states that the Tech 6 job description provided by NGM did not "accurately reflect" his job or "the reality of how the organization" operated. ECF No. 75-1 at 4.

But according to Dooley's deposition, he testified that the Tech 6 job description provided by NGM was applicable to him, in place, and active when he was a Tech 6. ECF No. 69-4 at 18, 21.

Accordingly, the Court finds that there is no genuine issue as to the essential functions of the Tech 6 position. Dooley has failed to produce admissible evidence that creates genuine issue. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (holding that a "trial court can only consider admissible evidence in ruling on a motion for summary judgment").[2] The Court also finds that NGM has provided admissible evidence, the job description, which is corroborated by deponent testimony, that establishes the essential functions of the Tech 6 position. The essential functions of the Tech 6 position include the skills and functions of a Tech 5 and all subsequent tech levels, the listed maintenance functions, and the physical essential functions as outlined previously in this section.

> ii.    *Dooley has failed to produce evidence that raises genuine issue as to whether he could perform the essential functions of the Tech 6 position without accommodation.*

With the essential functions of the Tech 6 position established, the Court considers whether Dooley can perform them with or without reasonable accommodation. In the Ninth Circuit, district courts are to first "consider whether [the plaintiff] can perform the job's essential functions without reasonable accommodation, and then, if he cannot, whether he can do so with reasonable accommodation." *Dark*, 451 F.3d at 1086 (citing *Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1231 (9th Cir. 2003)). Again, this determination takes place as to Dooley's abilities to perform the essential functions of the position at the time of his termination. *See, e.g., Kaplan*, 323 F.3d at 1230 (addressing first whether the plaintiff could perform the position's essential functions without reasonable accommodation when he was terminated).

NGM argues that Dooley could not perform the essential functions of the Tech 6 position without reasonable accommodation. ECF No. 69 at 11–14. In determining whether a disabled

---

[2]   If the Court were to agree with Dooley that the essential functions of his Tech 6 position only included the PM Route, the Court would implicitly find that the essential functions of a Tech 6 position entirely depend on the employee who holds the position and what tasks they are most frequently assigned. Such a finding would be improper and inconsistent with the ADA as essential functions of a position are traditionally, but not solely, based on the employer's understanding of the position and judgment as to what functions are essential. *See* 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(3).

13

employee is qualified to perform the essential functions of a position, the employer may rely on the employee's most up-to-date medical documentation. *Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003) (affirming grant of summary judgment and deeming employer's reliance on a plaintiff's medical documentation "appropriate" in finding he was only qualified for a sedentary desk job); *Kaplan*, 323 F.3d at 1230 (9th Cir. 2003) (relying on the "uncontroverted medical evidence presented to the [employer] at the time of [the employee's] termination" which indicated the plaintiff could not perform essential functions of the position).

Here, it is undisputed that Dooley's physician laid out his physical capabilities and restrictions in the "Return to Work" form. *See* ECF No. 69-23 at 2. It is also undisputed that the "Return to Work" form was Dooley's most up-to-date medical documentation at the time of his termination. In the form, Dooley's physician classified his capabilities as "Permanent" and specifically categorized them as "Sedentary." *Id*. The physician specifically noted Dooley's lifting, carrying, sitting, standing, bending, reaching, squatting, twisting, and right and left hand and foot use abilities in the form. *Id*. Dooley was released to lift: 10 pounds, up to 3 times per hour; 5 pounds, up to 10 times per hour; and zero pounds, over 10 times per hour. *Id*. Dooley was released to carry: 15 pounds, up to 3 times per hour; 10 pounds, up to 10 times per hour; and 5 pounds, over 10 times per hour. *Id*. Dooley was released to sit 10 minutes continuously for up to 3 hours per day. *Id*. Dooley was released to stand 20 minutes continuously for up to 5 hours per day. *Id*. The physician did not release Dooley to bend, squat, or twist. *Id*. Finally, the physician released Dooley to reach and use his right and left hands and feet up to 3 times per hour. *Id*.

Comparing Dooley's physician implemented physical restrictions at the time of his termination to the physical essential functions of the Tech 6 position, reveals that he physically cannot perform those essential functions without accommodation. The undisputed facts establish that Dooley was not cleared by his physician to bend, squat, and twist, but the physical essential functions of the Tech 6 position require him to twist, stoop, kneel, crouch, and crawl. *Compare* ECF No. 69-23 at 2 *with* ECF No. 69-25 at 63. The undisputed facts also establish that Dooley's physician released him to lift a maximum of 10 pounds up to 3 times per hour and carry a maximum of 15 pounds up to 3 times per hour, but the physical essential functions of the Tech 6 position

14

require him to be able to lift and carry a minimum of 60 pounds up to 1-5% of the workday. *Compare* ECF No. 69-23 at 2 *with* ECF No. 69-25 at 62. Third, the undisputed facts establish that Dooley was released to stand for a maximum of 20 minutes continuously, for up to 5 hours per day, but the physical essential functions of the Tech 6 position require him to stand up to 66% of the workday. *Compare* ECF No. 69-23 at 2 *with* ECF No. 69-25 at 67. Fourth, the undisputed facts establish that Dooley's physician released him to reach and use his hands and feet up to 3 times per hour, but the physical essential functions of the Tech 6 position require him to climb ladders, pull and push 50 pounds, and reach below the knees up to 1-5% of the workday; climb scaffold/manlift, reach waist to knees, reach chest to shoulders, and reach above shoulders up to 6-33% of the workday; and grip, climb stairs, and reach waist to chest up to 66% percent of the workday. *Compare* ECF No. 69-23 at 2 *with* ECF No. 69-25 at 61–67.

A simple cross-comparison of the Tech 6 job description, which establishes the physical essential functions of the position, and Dooley's most up-to-date medical documentation at the time of his termination, plainly exposes his inability to perform many of the physical essential functions without accommodation. Accordingly, the Court finds that Dooley has not produced evidence raising genuine issue as to whether he could perform the essential functions of the Tech 6 position without accommodation.

> iii.     *Dooley has also failed to produce evidence that raises genuine issues as to whether he could perform the essential functions of the Tech 6 position with accommodation.*

The parties dispute whether there is a genuine issue as to whether Dooley could perform the essential functions of the Tech 6 position with accommodation. Dooley has the burden of showing the existence of a reasonable accommodation that would have enabled him to perform the essential functions of the Tech 6 position. *See Dark*, 451 F.3d at 1088; *see also Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (citation omitted). To avoid summary judgment, Dooley must show that a proposed accommodation seems reasonable on its face. *Dark*, 451 F.3d at 1088. Courts "should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999).

Dooley argues that the following job restructuring accommodations would have enabled him to perform the essential functions of the Tech 6 position: (1) assignment of only the PM Route; (2) provision of assistive equipment and lifting apparatuses; (3) team lifting; (4) the use of different body mechanics and positions; and (5) a reduced work schedule. ECF No. 75 at 12, 13. NGM argues that Dooley's job restructuring accommodations are not permissible because they either exempt him from performing the essential functions of the Tech 6 position or require NGM to create a new position which it has no duty to do under the ADA. ECF No. 69 at 16–21.

It is well-settled that job restructuring may be a form of reasonable accommodation under the ADA. *See* 42 U.S.C. § 12111(9)(B); *see also* 29 C.F.R. § 1630.2(o)(2)(ii). However, the "ADA does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees." *Dark*, 451 F.3d at 1089. Restructuring Dooley's job to only assign him the PM Route would exempt him from the various other essential functions of the position. The ADA does not require that NGM accommodate Dooley by restructuring his job if doing so would exempt him from performing the essential functions of the position. *See id*. (stating that the defendant did not need to restructure the plaintiff's position by exempting him from one of the position's essential duties).

Dooley's third restructuring request for "team lifting" fails for similar reasons. Although Dooley never directly defines "team lifting" he provides clues throughout his opposition response that "team lifting" consists of the team effort and teamwork that groups of employees exerted together to perform the lifting requirements of heavier projects, as referenced by Jacob Farley's deposition. *See generally* ECF No. 75-4. It is undisputed that Dooley was not released to bend, squat, or twist, almost all of which are physical movements required to safely place a person into a "ready-to-lift" position. Layer onto that, Dooley's undisputed lifting restriction that he can only lift a maximum of 10 pounds, and it is almost certain that Dooley would not even be a member of the "team" performing the lift. In such cases, this restructuring request seeks to both exempt

Dooley from performing the physical lifting essential function of the Tech 6 position and reallocate it to other employees, both of which the ADA does not require.[3] *See Dark*, 451 F.3d at 1089.

Dooley also argues NGM could have restructured his job to provide him with assistive equipment and lifting apparatuses such as forklifts, hoists, cranes, dollies, and elevators. ECF No. 75 at 12, 13. However, Dooley has failed to produce any evidence that he could operate assistive equipment and lifting apparatuses in light of his restrictions. Moreover, the record clearly establishes that the operator of such equipment and apparatuses is required to perform certain physical tasks that NGM determined Dooley could not perform with his physical restrictions. *See* ECF No. 69-6 at 6. In fact, the record does not contain evidence that Dooley could operate the equipment and apparatuses he suggests but, instead, is ripe with Dooley's conclusion that he could operate equipment because he was "qualified." *See generally* ECF No. 75-3.

Dooley argues that NGM should restructure his position to account for his "ability to adapt body mechanics to the tasks" he was required to perform. ECF No. 75 at 13, 22. For example, Dooley argues that he could do certain tasks sitting down, that he could walk instead of standing, kneel instead of bending and squatting, and turn his entire body instead of twisting. *Id*. at 13. Dooley's proposed body positioning adaptations are not only illogical but present obvious physical safety concerns for a historically injury-ridden Dooley. The Court will not waste its time and judicial resources contemplating whether Dooley can walk without standing. More importantly, the Court will not entertain the notion that NGM should compromise Dooley's safety by providing him with an accommodation that would require Dooley—who has had two total knee replacements—to somehow drop onto his knees so that he can kneel instead of bending or squatting because his restriction "does not say that he could not kneel."

As a form of job restructuring, Dooley brings up a reduced work schedule as an accommodation in his opposition response. ECF No. 75 at 12. It is unclear if Dooley made this request at the time and NGM argues he did not. ECF No. 69 at 15. Regardless, Dooley does argue

---

[3]  Of note here, "team lifting" would only accommodate the physical lifting essential function of the Tech 6 position. It would not accommodate the various other physical essential functions of the position that he cannot perform such as Dooley's inability to twist, one of the position's physical movement essential functions.

that because a reduced schedule is a reasonable accommodation under the ADA, NGM should have considered it in conjunction with his attempt to return to work. ECF No. 75 at 11. A reduced work schedule alone would be ineffective at accommodating Dooley so that he could perform the essential functions of the Tech 6 position because those essential functions would remain the same regardless of the number of hours Dooley worked. Reducing his hours, without simultaneously changing the essential functions of his position, would not change Dooley's inability to perform the position's essential functions. To make the accommodation effective here, NGM would have to reduce the number of hours Dooley worked and assign him lighter duty tasks. As held in this Order, the assignment of lighter duty tasks is not a reasonable accommodation because it exempts Dooley from the essential functions of the position. Moreover, reducing Dooley's work schedule merely reallocates the essential functions of his position to other employees.

Unrelated to job restructuring, Dooley argues that an additional leave of absence would have allowed him more time to heal. ECF No. 75 at 12. NGM claims that additional leave was not a reasonable accommodation this time because (1) NGM already granted Dooley 55-weeks of leave and (2) when he was finally released to return to work, he was released with "permanent" capabilities and "sedentary" physical restrictions so that "even if he was able to return to work at some time in the future" his restrictions could not be accommodated. ECF No. 69 at 23, 24. "A leave of absence for medical treatment may be a reasonable accommodation under the ADA." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135 (9th Cir.2001) (citation omitted).

It is undisputed that NGM reasonably accommodated Dooley when it provided him with short-term disability leave in December of 2017 and extended that leave on two separate occasions in March and September of 2018. *See* ECF Nos. 69-16, 69-20, 69-21. At each of those extensions, the physician indicated Dooley could not work. *See id.* This was no longer the case when Dooley requested additional leave at the time of his termination because Dooley and his physician supplied NGM with his "Return to Work" form, a form that indicated Dooley could return to work within the specific parameters. *See* ECF No. 69-23 at 2. These parameters included Dooley's "permanent" capabilities and "sedentary" physical restrictions (*Id.*) which the Court has found render him unable to perform the essential functions of the Tech 6 position. Thus, an additional leave of

18

absence would not reasonably accommodate Dooley's disability because it would not permit him, upon his return, to perform the essential functions of the Tech 6 position. See *Humphrey*, 239 F.3d at 1135–36 ("where a leave of absence would reasonably accommodate an employee's disability and permit him, upon his return, to perform the essential functions of the job, that employee is otherwise qualified under the ADA." citing *Nunes*, 164 F.3d at 1247)). Dooley's request for extended medical leave around the time of his termination is not reasonable because his physician released him to work but he could not return to his former position and could not state when and under what conditions he could return to work. *See Dark*, 451 F.3d at 1090; *see also Lezama*, 817 F.App'x at 345 (recognizing that a plaintiff failed to show extended medical leave would reasonably accommodate him because he provided no evidence that he would be able to perform the essential functions of his position following a finite extension of medical leave).

Accordingly, the Court finds that the job restructuring accommodations Dooley requested are not permissible because they require that NGM either exempt Dooley from the physical essential functions of the Tech 6 position or reallocate the physical essential functions to other employees. Additionally, the Court finds that granting Dooley extended leave was not a reasonable accommodation because Dooley's permanent capabilities and sedentary restrictions were known at the time of his termination and extended leave would not have permitted him to be able to perform the essential functions of the Tech 6 position later.

2. <u>Dooley has failed to demonstrate that he is a "qualified individual" who could perform the essential functions of an existing and vacant reassignment position with or without accommodation.</u>

As another form of accommodation. Dooley requests job reassignment. ECF No. 75 at 8. Specifically, Dooley claims that he could have been reassigned to other "vacant jobs" such as "Tool Room Operator, Forklift Operator, and Lab Maintenance Tech[.]" *Id*. NGM argues that reassignment was not possible. ECF No. 69 at 21–23. Reassignment to a vacant position may be a form of reasonable accommodation under the ADA. *See* 42 U.S.C. § 12111(9)(B); *see also* 29 C.F.R. § 1630.2(o)(2)(ii). In fact, a person can be a "qualified individual" under the ADA if he "can 'perform the essential functions of a reassignment position, with or without reasonable

accommodation, even if [he] cannot perform the essential functions of the current position.'" *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 959 (9th Cir. 2013) (quoting *Dark*, 451 F.3d at 1089).

"In order for reassignment to a vacant position to be reasonable, an existing position must be vacant; there is no duty to create a new position for the disabled employee." *Wellington v. Lyon Cty. Sch. Dist.*, 187 F.3d 1150, 1155 (9th Cir. 1999) (citation omitted). Dooley has failed to offer any evidence that "Tool Room Operator" and "Forklift Operator" are actual existing positions at NGM and were vacant at the time of his termination. In fact, Dooley has offered no evidence to contest the record which undisputedly establishes that "Tool Room Operator "and "Forklift Operator" are tasks or duties assigned to employees, not standalone positions. *See* ECF No. 69-6 at 4; *see also* ECF No. 69-29 at 8. Moreover, both reassignment requests would require NGM to create entirely new positions for Dooley and employers do not have a duty to create new positions to accommodate disabled employees. *See Hansen v. Robinson Nevada Mining Co*., 668 F. App'x 257, 258 (9th Cir. 2016) ("the ADA does not require the creation of a position as a reasonable accommodation" citing *Wellington*, 187 F.3d at 1155).

For these reasons, Dooley's "Tool Room Operator "and "Forklift Operator" reassignment accommodation requests are not permissible and not reasonable.[4] *See Mendoza v. The Roman Cath. Archbishop of Los Angeles*, 824 F.3d 1148, 1150 (9th Cir. 2016) (affirming summary judgment for employer on employee's reasonable accommodation claim because plaintiff failed to establish that a full-time position was available); *see also Ricasa v. Dep't of Hum. Servs.*, Case No. 19-17288, 2022 WL 501568, at *1 (9th Cir. 2022) (stating summary judgment for employer was warranted because plaintiff's failed to present evidence showing that any permanent light duty positions existed for youth corrections officers).

The same cannot be said of Dooley's "Lab Maintenance Tech" reassignment accommodation request. The record contains conflicting testimony as to whether this was a

---

[4]   Dooley claims that Johnny Burwell—a former employee—is evidence that NGM has provided a disabled person with a reassignment accommodation to the forklift and tool room in the past. ECF No.75 at 5. The fact that a former employee may or may not have been assigned certain tasks more frequently after he was injured does not properly support what Dooley must establish, namely that "Forklift Operator" or "Tool Room Operator" are existing standalone positions at NGM and were vacant at the time Dooley was terminated.

standalone position or an assigned task. *Compare* ECF No. 69- 4 at 26–28 (referring to an open lab tech "position" subject to the collective bargaining agreement bidding process) *and* ECF No. 69-29 at 8 (referring to a "lab maintenance technician" as a "job") *with* ECF No. 75-2 at 21 (referring to a "lab maintenance tech" as a "task or assignment"). Viewing the evidence in a light most favorable to Dooley, the Court assumes "Lab Maintenance Tech" is an actual position. It is further disputed by the record if Dooley contacted NGM about reassignment to the lab technician "position" in April of 2018. *Compare* ECF No. 69-4 at 26 (Dooley claiming he spoke with Armstrong about coming back to work and the "lab position" in April of 2018) *with* ECF No. 69-10 at 6 (Armstrong claiming she did not have a conversation with Dooley about him coming back to work in April of 2018).

The Court notes that there is genuine issue here as to whether Dooley and Armstrong had a conversation about reassignment to the "position" in April of 2018. However, this dispute is of immaterial fact because it does not affect the outcome of this suit. *See Liberty Lobby*, 477 U.S. at 248 (stating a "material fact" is a fact "that might affect the outcome of the suit under the governing law"). Whether the lab tech "position" exists and was vacant around April of 2018 is irrelevant because whether this reassignment position was reasonable turns on whether the position exists and was vacant at "at the time of the employment decision." *See Anthony*, 955 F.3d at 1129; *see also Dark*, 451 F.3d at 1087; *Weyer*, 198 F.3d at 1112. In other words, for reassignment to the lab tech "position" to be reasonable, Dooley needed to provide evidence that the "position" exists and was vacant in December of 2018 when NGM terminated him, not around April of 2018 when his physician had not yet released him to work. Accordingly, the Court finds that Dooley has failed to produce evidence that establishes the lab tech "position" exists and was vacant in or around December of 2018, the time of the employment decision. As such, the reassignment request fails.

For these reasons, the Court finds that Dooley has failed to provide evidence that creates genuine issues as to the following material facts: (1) the essential functions of the Tech 6 position; (2) whether he could perform the essential functions of the Tech 6 position without accommodation at the time of the employment decision; (3) whether he could perform the essential functions of the Tech 6 position with accommodation at the time of the employment decision; and

(4) whether he could perform the essential functions of a vacant and existing reassignment position with or without accommodation at the time of the employment decision. Accordingly, Dooley has failed to establish a prima facie case of failure to accommodate under the ADA, specifically that he is a "qualified individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See Bates*, 511 F.3d at 989 (citations omitted).

3. <u>Dooley has failed to demonstrate that NGM failed to engage in good faith in the interactive process regarding his return to work and possible accommodation.</u>

Dooley argues that there are issues of fact regarding NGM failing to act in good faith in an individualized interactive process to find accommodation for him. ECF No. 75 at 23. Dooley claims that a myriad of facts support a finding of bad faith. ECF No. 75 at 9–11. NGM claims that it participated in good faith and that Dooley has failed to carry his burden in showing the existence of a reasonable accommodation that NGM failed to provide. ECF No. 79 at 16. "[O]nce an employee requests an accommodation ... the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *UPS Supply Chain,* 620 F.3d at 1110 (citing and quoting *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir.2002)). "The interactive process requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Zivkovic*, 302 F.3d at 1089. The employer is not required to provide the employee with his requested or preferred accommodation; "the employer need only provide some reasonable accommodation." *UPS Supply Chain*, 620 F.3d at 1110–11 (citation omitted).

An employer can demonstrate good faith by pointing to "cooperative behavior which promotes the identification of an appropriate accommodation." *Barnett v. U.S. Air, Inc*., 228 F.3d 1105, 1115 (9th Cir. 2000), vacated sub nom. by *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). "Employers should meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss

available alternatives when the request is too burdensome." *Id*. The employer "cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process[.]" *Id.* at 1116.

The Court finds that Dooley has failed to provide evidence that NGM failed to engage in good faith in the interactive process with him. The record indisputably establishes that NGM proactively requested information from Dooley regarding his condition and ability to work, held multiple face-to-face meetings with Dooley to explore his restrictions and preferred accommodations, reviewed his restrictions against the essential functions of the Tech 6 position, considered his preferred accommodations, and attempted to brainstorm alternative accommodations that would allow Dooley to return to work.

NGM sent Dooley a letter warning him that his disability leave was set to exhaust on December 8, 2018, and instructed him to contact NGM immediately if he believed he could return to work and perform the essential functions of his position with or without reasonable accommodation. ECF No. 69-22 at 2. Dooley admitted he received the letter and understood what it said. ECF No. 75-3 at 58, 59. In his own deposition testimony, Dooley confirmed that: (1) NGM received Dooley's "Return to Work" form around the end of November 2018; (2) Dooley met Armstrong and Bill Bodin in-person on one occasion, and only Armstrong on other occasions, to discuss coming back to work, his preferred accommodations, his qualifications and other skills, and other available positions at different locations; (3) NGM extended his employment past December 8, 2018, in order to continue the interactive process; and (4) in a subsequent meeting, Armstrong and Dooley went through a list of available jobs at NGM. ECF No. 75-3 at 59–70. These facts, which Dooley admitted in his own deposition, are all corroborated by Armstrong in her deposition testimony ECF No. 69-10 at 5–8, 12.

It is undisputed that NGM engaged in direct communication with Dooley to explore his restrictions, preferred accommodations, qualifications, and other skills. It is further undisputed that NGM considered Dooley's preferred accommodations and even considered accommodations that he did not request. Lastly, it is undisputed that NGM extended Dooley's leave to continue the interactive process, provided him a list of existing vacant positions, and that, after brainstorming

possible ways to accommodate him, it determined that he could not be accommodated considering his medical restrictions. The Court will not view such facts as evidence of "bad faith" as Dooley suggests it should.

For these reasons, the Court finds that Dooley has failed to provide evidence that creates a genuine dispute as to whether NGM engaged in good faith in the interactive process with him. Accordingly, and in conjunction with the Court's finding that Dooley failed to establish that he is a "qualified individual" under the ADA, the Court grants NGM's motion for summary judgment as to Dooley's failure to accommodate claims under the ADA and Nev. Rev. Stat. § 613.330.

**B.  __Disparate Treatment under the ADA__**

The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability. *See* 42 U.S.C. § 12112(a). The Ninth Circuit has recognized that "a failure-to-accommodate claim 'is analytically distinct from a claim of disparate treatment or impact under the ADA.'" *Dunlap v. Liberty Nat. Prod., Inc*., 878 F.3d 794, 798 (9th Cir. 2017) (citing and quoting *Johnson*, 666 F.3d at 567). Disparate treatment claims brought under the ADA are typically analyzed according to the *McDonell-Douglas* burden-shifting framework which first requires the plaintiff to establish a prima facie case.[5] *See Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014); *see also Snead v. Metro. Prop. & Cas. Ins. Co*., 237 F.3d 1080, 1093 (9th Cir. 2001); *Floyd v. Cnty. of Maricopa*, Case No. 16-15450, 2017 WL 2480738, at *1 (9th Cir. 2017).

As a preliminary matter, the Court must address Dooley's argument that the *McDonnell-Douglas* burden shifting framework does not apply here because he has offered direct evidence of discrimination. ECF No. 75 at 22. Dooley points to Armstrong's deposition testimony as direct evidence of discrimination but in doing so misinterprets her testimony. Dooley claims that "Amy Armstrong testified that it was his health and disability that ended his employment." *Id*. When directly asked if Dooley was terminated because of his health, Armstrong responded, "We were unable to accommodate, given the extent of his restrictions." ECF No. 75-2 at 28. And when directly asked if Dooley was "too disabled to do that job," Armstrong responded that NGM based

---

[5]   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

its employment decision on "the paperwork that we had from his doctor that said 'Permanent restrictions,' […] after we completed an extensive interactive process." *Id*. Nowhere in Armstrong's testimony does she state Dooley was terminated because of his disability. Instead, her testimony establishes that NGM's decision to terminate was based on its inability to accommodate Dooley in light of the medical paperwork that outlined his restrictions after an extensive interactive process. This is hardly "direct evidence" of discrimination like Dooley claims.[6]

To establish a prima facie disparate treatment case for discriminatory termination under the ADA, Dooley must show that (1) he is a disabled person within the meaning of the ADA; (2) he is a qualified individual, meaning he can perform the essential functions of his job; and (3) NGM terminated him because of his disability. *See Nunes*, 164 F.3d at 1246 (citing *Kennedy v. Applause*, 90 F.3d 1477, 1481 (9th Cir.1996)). The Ninth Circuit has held that "an ADA discrimination plaintiff … must show that the [termination] would not have occurred but for the disability." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1104–07 (9th Cir. 2019). If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its employment action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003) (citation omitted); *see also Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175-76 (9th Cir. 1998) (citation omitted). If the defendant is successful, the burden shifts back to the plaintiff to show that the defendant's "stated reason for [termination] was in fact pretextual." *Id*. at 52.

NGM argues that Dooley's disparate treatment claim for wrongful termination must fail because he is not a "qualified individual" within the meaning of the ADA. ECF No. 69 at 27. More specifically, NGM claims that if the Court finds that Dooley failed to establish that he is a qualified individual under the ADA for his failure to accommodate claim, he must have similarly failed to establish it as to his disparate treatment claim. *Id*. In his response, Dooley somewhat echoes this

---

[6] Armstrong's proffered reason for Dooley's termination has been held by the Ninth Circuit to constitute a legitimate, nondiscriminatory reason for termination. *See Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc*., 642 F.3d 728, 746 (9th Cir. 2011) (reasoning that employee's inability to perform the essential functions of his position with his restrictions, and the employer's inability to reasonably accommodate him with those restrictions, is a legitimate, nondiscriminatory reason for termination).

rhetoric by claiming that his wrongful termination claim is practically the same as his failure to accommodate claim. ECF No. 75 at 18.

In the Ninth Circuit, a plaintiff bringing either a failure to accommodate or disability discrimination claim must establish that he is a "qualified individual" per the ADA as part of his prima facie case. *Smith*, 727 F.3d at 955 (citing *Nunes*, 164 F.3d at 1246). In this Order, the Court has held that Dooley failed to raise genuine issue of material fact as to his status as a "qualified individual" as part of his prima facie failure to accommodate burden. *See* failure to accommodate under the ADA discussion *supra* Section III.A. Therefore, the Court finds that Dooley similarly fails to satisfy his burden of establishing that he is a "qualified individual" under the ADA as is required of him in making a prima facie showing for his disparate treatment, wrongful termination claim. *See Skinner v. Newmont USA Ltd*., Case No. 21-15623, 2022 WL 10382931, at *2 (9th Cir. 2022) (stating "to the extent that [the plaintiff] stated a discrimination claim based on a theory other than failure to accommodate, the district court did not err in granting [the defendant] summary judgment, because any other discrimination claim would likewise require [the plaintiff] to demonstrate that he is a qualified individual." citing *Smith*, 727 F.3d at 955). Accordingly, the Court grants NGM's motion for summary judgment as to Dooley's disparate treatment, wrongful termination claims under the ADA and Nev. Rev. Stat. § 613.330.

## C.   **Additional Considerations**

### 1.   Dooley's claim that NGM has a "100% Healed Policy" does not preclude summary judgment because it is supported by inadmissible and contradictory evidence.

Dooley argues that "he was told several times that he would need to be 100% healed and full duty to return to his job" which is a "*per se* violation of the ADA" and "precludes summary judgment." ECF No. 75 at 28. NGM argues that there is "no admissible evidence before this Court that [NGM] had a 100% release policy." ECF No. 79 at 17. The Court agrees with NGM.

In this Order, the Court has held that it will not consider nor rely on Dooley's declaration which is attached to his opposition response. *See* failure to accommodate under the ADA discussion *supra* Section III.A. For the sake of viewing the evidence in a light most favorable to Dooley, however, the Court will entertain the content of the declaration briefly. In his declaration,

Dooley states that on "several occasions I was told that it was [NGM's] policy to require me to be released 100% full duty without restrictions to be able to come back to my original job" and that someone at NGM told him that "I could only return to work if I was 100% healed and could work full-duty without an accommodation." ECF No. 75-1 at 5, 6.

Even if the Court were to consider his declaration admissible, his statements are inconsistent with his prior deposition testimony. Dooley testified that he was aware of an NGM coworker who "broke his leg" and "then before he was able to get a hundred percent, he was also made into a foreman" and returned to work. ECF No. 75-3 at 79. Similarly, Dooley testified that he knew of other individuals that were able to come back to work before they were released. *Id*. at 79–80. The one instance in which Dooley alleges a particular person told him about the "100% healed policy" is in reference to an early meeting with Armstrong. ECF No. 75-3 at 68. However, shortly after testifying that Armstrong told him about the policy, Dooley admits that he "could not tell" if she talked about the policy and that he did not know if Armstrong spoke about it. *Id*.

Accordingly, the Court finds that Dooley's allegation that NGM had a 100% healed policy which prevented him from being accommodated to be supported by inadmissible forms of contradictory evidence and, therefore, does not preclude summary judgment. *See Tobin*, 747 F. App'x at 585; *see also Dubois*, 453 F.3d at 1180; *Nelson*, 571 F.3d at 927.

> 2.  <u>The Court does not rely on Dooley's conflicting contemporaneous disability benefits applications and statements as support for its finding that summary judgment is appropriate and, further, makes no express judicial estoppel finding on such grounds.</u>

NGM argues that Dooley's contemporaneous statements on, applications for, and awards of disability benefits strongly support the conclusion that he was unable to perform the essential functions of his Tech 6 position or any reassignment position. ECF No. 69 at 24. Dooley offers a plethora of rebuttal arguments here including (1) social security or other disability applications or benefits are not relevant in a failure to accommodate case; (2) Dooley signed the disability benefits applications one time on November 17, 2017, so his signature on subsequent disability applications are irrelevant; (3) the facts of NGM's cited authority are distinct from the facts here; and (4) Dooley satisfactorily explained any discrepancies. ECF No. 75 at 28–30. In reply, NGM claims

that Dooley failed to provide a sufficient explanation for the discrepancies. ECF No. 79 at 14. NGM also argues that, at the summary judgment stage, the Court does not need to make a finding of estopppel based on Dooley's contemporaneous statements on, applications for, and awards of disability benefits, and instead, may consider them as admissible supporting evidence that Dooley was not a "qualified individual." *Id* at 15. As it would be clear error not to apply controlling Supreme Court precedent, the Court must address the potential conflict between Dooley's contemporaneous applications, statements, and awards for disability benefits and his ADA claims.

In November or December of 2017, Dooley applied for short-term disability benefits through his employer because of his lumbar spine surgery. ECF No. 69-16 at 2. In March and September of 2018, Dooley applied for extensions of his short-term disability benefits through his employer. ECF Nos. 69-20, 69-21. In all these applications, Dooley stated that he was applying "for benefits on account of total disability." *See id.*; *see also* ECF No. 69-16. Dooley further admitted that he received weekly indemnity payments from NGM "based upon being unable to work" through December 8, 2018. ECF No. 69-4 at 23, 24. Moreover, Dooley admitted that he applied for and received social security benefits during this time. *Id.* at 35. According to NGM, these applications for, statements on, and awards of disability benefits support the conclusion that Dooley was unable to perform the essential functions of his Tech 6 position or any existing and vacant reassignment position with or without accommodation, something that he must expressly establish as part of his prima facie cases on his ADA claims. ECF No. 69 at 24, 25.

The Court is guided by the framework established in *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), and further clarified by the Ninth Circuit in *Smith*, 727 F.3d 950, to analyze the potential discrepancy between Dooley's ADA claims and his disability benefits. First, the Court analyzes whether Dooley's ADA claims "inherently" conflict with his applications for short-term disability benefits so as to warrant a "negative presumption" against his ADA claims. *Smith*, 727 F.3d at 956 (citation omitted). If not, the Court analyzes whether Dooley's disability benefits "genuinely" conflict with his ADA claims as to "negate an essential element" of those claims. *Id.* If the Court determines a "genuine conflict" exists, the Court must analyze whether Dooley has offered "a sufficient explanation for any inconsistency." *Id.*

Here, the Court finds that no inherent conflict exists between Dooley's applications, statements, and awards of insurance disability benefits and social security disability benefits because they do not consider his ability to perform the essential functions of the position with accommodation. *See Smith*, 727 F.3d at 956–57 (citing *Cleveland*, 526 U.S. at 802–03) (holding that private insurance disability benefits do not inherently conflict with ADA claims because, like social security disability insurance benefits, "it is possible that a person could claim he or she qualifies for disability benefits and still be able to work if accommodated").

Next, the Court finds that Dooley's contemporaneous applications for, statements on, and awards of disability benefits do in fact "genuinely conflict" with his ADA claims because they tend to "negate an essential element" of those claims. Dooley's theory is that he could return to work and do his job if he received an accommodation, but yet when he applied for the extensions of his disability benefits, he continuously confirmed that he was applying for extended "benefits on account of total disability." Such statements are inconsistent with his theory that he could do his job or another reassignment job with reasonable accommodation.

However, the Court need not determine if Dooley has offered a "sufficient explanation" for the existing "genuine" inconsistency because the Court has not relied upon Dooley's contemporaneous applications for, statements on, or awards of disability benefits, in granting summary judgment today. Not once has the Court referenced these applications, statements, or awards as grounds for its holdings. Instead, the Court relies on Dooley's failure to produce admissible evidence that creates genuine issue as to the various material facts stated herein. In other words, the Court's findings of summary judgment are based on the uncontroverted and undisputed facts of this case, none of which are Dooley's contemporaneous applications for, statements on, or awards of disability benefits. For this reason, the Court need not explicitly rule on whether Dooley has offered a sufficient explanation for the apparent conflict between the contemporaneous applications, statements, and awards of disability benefits and his ADA claims.

The Court's refusal to make a judicial estoppel finding on such grounds, and its summary judgment findings, are consistent and aligned with the overarching theme from *Clevland* and *Smith* that "a situation could arise in which a person makes a representation on one of these disability-

benefit forms about his or her present ability that differs from his or her ability at the time of the relevant employment decision." *Smith*, 727 F.3d at 957 (citing *Cleveland*, 526 U.S. at 805). This is one of those situations.

Finally, the Court denies as moot NMG's motion for summary judgment as it pertains to Dooley's request for economic damages as no substantive claims remain.

## IV.    CONCLUSION

IT IS THEREFORE ORDERED that NGM's motion for summary judgment (ECF No. 69) is **GRANTED in part** and **DENIED in part** in accordance with this Order: NGM's motion is **GRANTED** as it pertains to Dooley's failure to accommodate claims under the ADA and Nev. Rev. Stat. § 613.330, *et seq*.; NGM's motion is **GRANTED** as it pertains to Dooley's disparate treatment, wrongful termination claims under the ADA and Nev. Rev. Stat. § 613.330, *et seq*.; and NGM's motion is **DENIED as moot** as it pertains to Dooley's request for economic damages.

The Clerk of the Court is directed to enter judgment accordingly and close this case.

IT IS SO ORDERED.

DATED this 3rd day of November, 2023.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE